## MARVIN G. TSCHIDA v. RICHARD DORLE.[1]

January 25, 1952.

No. 35,286.

*John Edmund Burke,* for appellant.
*Murnane & Murnane,* for respondent.

MAGNEY, JUSTICE.

State highway No. 36 runs east and west. Hazelwood avenue intersects it in rural Ramsey county. On September 8, 1947, about 1:15 a. m., plaintiff, Marvin G. Tschida, then 20 years old, was a passenger on a motorcycle which was traveling west on highway No. 36 approaching Hazelwood avenue. The motorcycle was operated by one Harvey Stockness. Defendant, Richard Dorle, was op-

[1]Reported in 51 N. W. (2d) 561.

erating his automobile easterly on the same highway. Dorle turned to his left to drive north on Hazelwood avenue. The car and the motorcycle collided, and plaintiff was injured. The action which he brought resulted in a verdict for defendant. This appeal is from an order denying plaintiff's motion for judgment notwithstanding the verdict or a new trial.

Highway No. 36 is black-topped, 22 feet wide, center-lined, with a shoulder on the north side four feet wide. Hazelwood avenue is an oiled, graveled road. Seventy-five feet north of the shoulder of highway No. 36 the driving surface of the avenue is 20 feet wide. Thirty to 35 feet north it is 25 feet wide. As the avenue approaches the pavement, its driving surface flares out to the east and the west, so that when it reaches the north shoulder of the highway it is 66 feet wide. The shoulder on the west side of the avenue is three feet wide. For a quarter of a mile to the east and west of the avenue highway No. 36 is level. There is testimony that there is a slight dip in highway No. 36 about 300 or 400 feet east of the intersection.

Defendant's version of the accident is as follows: He was alone in his car, returning home from work. He was proceeding east along highway No. 36 and was driving at a speed not exceeding 35 miles per hour. As he lived toward the northeast, he intended to make a left-hand turn into Hazelwood avenue to go north. With this in mind, he put out his left hand and took his foot off the gas. He knew it was difficult to see an arm signal from an oncoming car at night, but thought that the arc light at the intersection would make it visible. When about two or three car lengths west of the intersection, he saw a vehicle with one light approaching from the east. He estimated the light to be approximately 200 to 250 feet from the intersection. As he approached for the turn, he cut in more to the center of the highway to "give the traffic the light to know that I was going to make a left turn." He started to make the turn. The oncoming single light was then 100 to 125 feet from him. As he was making the turn, it seemed to him that the light was approaching "a lot faster" than he had expected. When it was 50 or

60 feet from him, he determined that it was a motorcycle, and he watched it from that point until it hit him. It kept coming straight on, with no reduction in speed. Defendant estimated its speed when 50 or 60 feet from him to be between 60 and 70 miles per hour, and said that as he was making the turn he was traveling about 10 miles per hour. His right rear wheel was about one and one-half feet south of the north edge of the pavement when the motorcycle struck his right rear fender and wheel. About three or three and one-half feet of the automobile extended beyond the rear wheel. The car tipped up on the left wheels and then dropped back again. The car traveled from ten feet to a car length after it was hit and stopped on the east side of the avenue. It was not braked to a stop. Defendant testified:

"When I seen it close, I tried to step on the gas to get out.

"Q. Did you do that?

"A. Yes, but I didn't have speed, I was in high gear and did not have speed enough to get out of the road."

Up to the time of the collision, defendant had not crossed over to the east side of Hazelwood avenue. The motorcycle stopped about 75 feet west of the point of collision and was lying about the center of the south lane. Plaintiff was about five or ten feet west of the motorcycle, and Stockness was about 15 to 20 feet south and east of it on the shoulder.

Alvin Blatzheim, a deputy sheriff and witness for defendant, found dry dirt and other debris 12 inches south of the north edge of the pavement of highway No. 36 and about ten feet west of the center line of the avenue and two feet west of the west edge of the avenue. From that point marks led to the motorcycle.

The testimony of plaintiff and Stockness substantiate defendant's version of the accident in most respects. Plaintiff said that he first saw defendant's car when it was about a quarter of a mile west of the intersection, traveling in its own proper lane of travel. The motorcycle was then a little less than a quarter of a mile east of the intersection. There was no traffic between the two. He said the motorcycle was then traveling about 40 miles per hour. Highway

No. 36 was zoned for 50 miles per hour at night. Plaintiff continued to watch defendant's car until the actual impact. He said that the car came in a straight line until it made a sharp turn to the left just before the accident. He saw no signal for a left turn. As the automobile made the sharp turn to the left, the motorcycle was just in the intersection traveling about six feet from the north edge of the pavement. At the time of the crash, the car was west of the center line of the avenue. A second before the collision, when about 50 feet from the automobile, plaintiff uttered a warning to Stockness. No part of defendant's car was then entering the intersection. Before he gave warning, plaintiff determined that defendant's car was making a left turn. Stockness said that he saw the Dorle car when both the car and the motorcycle were about a quarter of a mile from the intersection. He also continued to watch the car. There was nothing to indicate to Stockness that defendant was not going to continue straight east on the south side of the pavement until he (Stockness) saw him turn. Defendant's car was going 50 miles an hour or better, but slowed down as he was cutting the corner.

Plaintiff makes 42 assignments of error. A few of them have merit.

Defendant himself testified that when he was two or three car lengths from the intersection he knew that a vehicle was approaching him in the north lane and 200 or 250 feet east of the avenue. When he refers to the intersection, he means the traveled portions of the roadways, where they adjoin. As he approached for the turn, he cut in more to the center of the highway, and when he started to make the turn the approaching vehicle was 100 to 125 feet from him. Defendant was then driving at ten miles per hour. He made his signal for a left turn, but knew that the signal was difficult to see at night by the operator of an oncoming vehicle. He did not know the speed of the oncoming vehicle when he commenced to make his turn. As the above facts are very important in the determination of this case, we feel that they bear repetition.

Defendant's own testimony shows that he did not comply with the standards of care in the operation of his car as declared by statute.

■ M. S. A. 169.19, subd. 1(2), provides:

"The driver of a vehicle intending to turn at an intersection shall do so as follows:

\* \* \* \* \*

"(2) Approach for a left turn on other than one-way roadways shall be made in that portion of the right half of the roadway nearest the center line thereof, and after entering the intersection the left turn shall be made so as to leave the intersection to the right of the center line of the roadway being entered;"

Defendant did not leave highway No. 36 at its intersection with the avenue at a point right of the center line of the avenue. He was leaving highway No. 36 considerably to the west of the center line of the avenue and obviously was intending to follow the curve created by the flared-out portion of the avenue in order to proceed north on the avenue. Section 169.18, subd. 1, provides:

"Upon all roadways of sufficient width a vehicle shall be driven upon the right half of the roadway, except as follows:" (No exception applicable here.)

Defendant himself testified that he violated the above statutes. Section 169.20, subd. 2, provides:

"The driver of a vehicle within an intersection intending to turn to the left shall yield the right of way to any vehicle approaching from the opposite direction which is within the intersection or *so close thereto as to constitute an immediate hazard,* but the driver, having so yielded and having given a signal when and as required by this chapter, may make such left turn, and the drivers of all other vehicles approaching the intersection from the opposite direction shall yield the right of way to the vehicle making the left turn." (Italics supplied.)

The statutory sections cited lay down a standard of care to the effect that the operator of a vehicle who makes a left turn without

entering the intersection in his proper lane and without yielding the right of way to automobiles or other vehicles approaching from the opposite direction so close as to constitute an immediate hazard is prima facie negligent. § 169.96.

Defendant did not wait until he entered the intersection before he made a left turn into the lane occupied by cars coming from the opposite direction. He thus violated the statute designed to keep vehicles in their proper lane for purposes of safety. The question, then, is whether there is a basis for holding, as a matter of law, that defendant was negligent when he made the left turn when to do so involved danger of collision with the motorcycle. In answering this question, in view of the verdict, the evidence most favorable to a finding of due care by defendant must be considered and given effect.

Defendant himself testified that he was traveling on a paved state highway at night, and that he turned to the left when he was 35 to 50 feet from the intersection. He placed his speed at ten miles per hour. At that rate, it would take at least three seconds to have the rear of his car clear the pavement. When he was 35 to 50 feet from the intersection, he knew that there was a vehicle approaching in the opposite lane about 200 to 250 feet away from the intersection. He did not know how fast it was going; but in the circumstances he could not safely assume that the speed of the approaching vehicle was any less than 50 miles per hour, the night speed limit established for that highway at that point. As he started to turn, he said that the vehicle was 100 to 125 feet from him. To clear the highway, he would have had to travel the width of the westbound lane, which he was crossing at an angle, plus the length of his car, estimated at 17 feet. When he saw the motorcycle 100 to 125 feet away from him, he would have had to travel up to 30 feet to clear the pavement. At ten miles an hour, that would take between two and three seconds. Since he was crossing the lane at an angle, he was cutting down the distance between his car and the motorcycle. If the motorcycle was traveling 50 miles an hour, it would take two seconds or less to cover the distance between it and

the car. Defendant could not consistently, with the exercise of due care, turn in front of a vehicle which he saw approaching and which might reach the intersection, if it were traveling at a reasonable, permissible speed, before he (defendant) could get his car off the pavement. That is what happened in this case. From his own statement, defendant turned into the path of the approaching vehicle, which he saw, at a time when his own estimate of distance and his admitted lack of knowledge of the speed of the approaching vehicle created a substantial risk that such vehicle, approaching at a permitted speed, would collide with him. The approaching vehicle was so close to the intersection as to constitute an immediate hazard if defendant proceeded to cross. A vehicle traveling at the speed which defendant says the motorcycle was traveling when it was 50 or 60 feet from him would certainly collide with him. In the exercise of due care, a defendant is under a duty to make allowances for errors in judgment as to speed and distance, made at night, when he sees a vehicle approaching in a lane of travel that he is about to enter and cross.

The conduct of defendant in violating these statutes was prima facie negligent. § 169.96. The effect of the operation of such a statute is stated in Demmer v. Grunke, 230 Minn. 188, 193, 42 N. W. (2d) 1, 5, as follows:

"* * * A statutory violation constituting prima facie evidence of negligence prevails as a controlling evidentiary factor against the violator only so long as there is an absence of evidence tending to show a reasonable ground for such violation or only so long as there is no actual evidence to justify a reasonable assumption that such violation was not negligent under the circumstances and would therefore not reasonably endanger himself or any other person entitled to the protection of the act. [Citation omitted.] The burden of producing such evidence of justification is upon the violator, but the moment such evidence appears from any quarter whatever the prima facie case against the violator not only ceases thenceforth to have any validity, but wholly vanishes from the litigation as an evidentiary factor, and thereupon the burden of going forward with

the evidence shifts to the opposing litigant. In the absence of evidence reasonably tending to show that the violator's conduct was not negligent under the circumstances, the prima facie case of negligence remains, and, if such negligence was a proximate cause of the accident, a directed verdict against the violator is in order."

There was no attempt by defendant to sustain the burden of justification of his statutory violation. There is no evidence in the case which shows any necessity for the illegal turn in front of the approaching vehicle, which he saw and which was so close as to constitute an immediate hazard. It is our opinion that defendant was guilty of negligence as a matter of law.

■ Plaintiff claims that the court erred in instructing the jury, as a matter of law, that the negligence of Stockness was imputed to plaintiff, and that if Stockness was negligent and his negligence contributed to cause the injury plaintiff could not recover. In view of the necessity of a new trial, we shall consider this alleged error. It is covered by plaintiff's assignment of error No. 32.

The motorcycle involved was owned by plaintiff's brother Raymond. On the evening in question plaintiff borrowed it. Later he drove it to Hudson, Wisconsin. Stockness was his passenger. They left Hudson shortly after midnight to return home. A short distance out of Hudson they stopped. Plaintiff asked Stockness if he would like to drive the motorcycle. Stockness said he would. From then on until the collision Stockness drove it, and plaintiff rode behind him as a passenger. On that state of the facts, the question is whether any negligence on the part of Stockness is imputed to plaintiff.

The plaintiff was asked the following questions and gave the answers indicated:

"Q. And having invited him to drive that motorcycle you, of course, could have taken over at any time along the way had you desired to?

"A. Yes, sir.

"Q. The motorcycle was under your control and consequently you had the right to say how he was to drive it?

"A. Yes.

"Q. You having had the right to say how it was to be driven, if it was not driven the way you wished you could take it over at any time?

"A. Yes, sir.

"Q. If Harvey drove the motorcycle at a speed you did not approve of, you had the right to control him, or tell him to slow down?

"A. Yes.

"Q. And you had the right to control him how he moved in and out of traffic?

"A. Yes, sir.

"Q. And so all Harvey was doing was driving the motorcycle at your request, he was under your control at all times?

"A. Yes, sir."

Plaintiff had borrowed the motorcycle from his brother. The relationship between the brothers was that of bailor and bailee. The relationship between plaintiff and Stockness was not that of bailor and bailee, but of master and servant or principal and agent. Plaintiff did not make a bailment of the motorcycle to Stockness. As to Stockness, plaintiff was in the same position as if he owned the motorcycle. He merely let him operate it, while plaintiff rode behind him.

Like an owner, plaintiff could have divested himself of control so as to become a guest in the bailed vehicle. See, Christensen v. Hennepin Transp. Co. Inc. 215 Minn. 394, 10 N. W. (2d) 406, 147 A. L. R. 945. But he did not do so. One can allow another to operate a vehicle of which he is owner or bailee under circumstances which create a master-servant relationship between the passenger and the operator. Thus, if plaintiff had hired Stockness as his chauffeur for the evening, it is clear that Stockness would have been his servant. Or, if Stockness had customarily driven plaintiff on trips which were solely the business of plaintiff, even though he did so gratuitously, it could be found that Stockness was the agent. Rogge v. G. N. Ry. Co. 233 Minn. 255, 47 N. W. (2d) 475.

The test to be applied in determining the existence of the master-servant relationship is stated in Frankle v. Twedt, 234 Minn. 42, 47, 47 N. W. (2d) 482, 487, where we said:

"* * * A servant is a person employed by a master to perform service in his affairs whose physical conduct in the performance of such service is controlled *or is subject to the right of control* by the master. Restatement, Agency, § 2. As applied to automobiles, the difference between a mere bailment relation and that of master and servant is the distinction between a mere permissive use and a use which is subject to the control of the master and connected with his affairs."

In the instant case, the normal inference of control retained in plaintiff, the bailee, is the only permissible inference, in view of the positive testimony of plaintiff that he retained his right to control and the absence of testimony by the driver that he recognized no right of control in plaintiff. We have already detailed plaintiff's testimony on this point. It is our opinion that the court did not err in giving the challenged instruction.

The other assignments of error need not be considered.

Order reversed and new trial granted.